**IN THE UNITED STATES DISCTRICT COURT**
**FOR THE TENTH CIRCUIT IN KANSAS**

| | | |
|---|---|---|
| **S. MIRZA** | ) | |
| 8961 Metcalf Ave., Apt. 393 | ) | |
| Overland Park, KS 66212 | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.** |
| | ) | |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **UWORLD, LLC., D/B/A** | ) | |
| **THEMIS BAR REVIEW** | ) | |
| 320 W. Ohio St., Suite 4W | ) | |
| Chicago, IL, 60654 | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

### I. Preliminary Statement

1.      COMES NOW, Plaintiff, S. Mirza, by and through her attorneys of record, Kevin Baldwin, Eric Vernon, and Sylvia Hernandez of Baldwin & Vernon, and brings this cause of action against Defendant UWorld, LLC, d/b/a Themis Bar Review, hereinafter referred to as "Defendant Company." This action seeks declaratory, injunctive and equitable relief, actual, compensatory and punitive damages, and costs and attorneys' fees may be awarded pursuant to 42 USC §2000e-5(k) and Federal Rules of Civil Procedure 54, for Defendant's conduct and actions taken against Plaintiff.

### II. Jurisdiction

2.      This action arises under Title VII of the Civil Rights Act of 1964 (Title VII), 42 USC §2000e et seq. (as amended) and the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA").

3.      Jurisdiction is invoked pursuant to 28 USC §1343 (4), 42 USC §2000e-5 (f), the EPA, 29 U.S.C. § 201, et seq. and 28 U.S.C. §§ 1331 and 1367.  A Right-to-sue letter was issued

1

by the Equal Employment Opportunity Commission (EEOC) on February 8, 2023. The Right To Sue Letter, including a copy of Plaintiff's original charge of discrimination filed with the EEOC, is attached hereto as exhibit 1 and is hereby incorporated as if fully set forth herein.

4.      Declaratory, injunctive, and equitable relief is sought pursuant to 28 USC §2201, §2202, 42 USC §1981a.

5.      Costs and attorney's fees may be awarded pursuant to 42 USC §2000e-5(k) and the Federal Rules of Civil Procedure 54 and are requested by Plaintiff.

6.      Plaintiff is alleging claims of employment discrimination and retaliation under Title VII of the Civil Rights Act of 1964 (Title VII), for discrimination based upon race, notional origin, sex, religion, retaliation and a sexually hostile work environment and for unequal pay pursuant to the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA").

7.      The Plaintiff, based upon reasonable belief at this time absent discovery, indicates that the amount of compensatory and/or special damages in controversy is in excess of $100,000.00; in addition, Plaintiff seeks declaratory, injunctive and equitable relief, as well as punitive damages.

**III. Venue**

4.      This action properly lies United States Federal Court for the District of Kansas, pursuant to 29 USC §1391(b), because the claim arose in this judicial district, and pursuant to 42 USC §2000e-5(f)(3) and because unlawful employment practices were committed in this judicial district.

**IV. Parties**

5.      Plaintiff is a resident of the United States residing at 8961 Metcalf Ave., Apt. 393, Overland Park, KS 66212.

6.      Defendant UWorld, LLC., d/b/a Themis Bar Review, hereinafter referred as "Defendant Company," is an employer engaged in an industry affecting commerce, and, upon information and belief, employs more than 100 regular employees. Defendant Company is a corporation, (containing within its charter the requisite authority to sue and be sued), and does business in this judicial district, doing business at various locations located within Johnson County, Kansas, at relevant times referred to herein.  Defendant Company is an employer within the meaning of 42 USC § 2000e *et seq*., 42 USC § 1981a *et seq*. and its home location is 320 W. Ohio St., Suite 4W, Chicago, IL.

7.      Prior to filing this Complaint for Damages, Plaintiff sought administrative relief through the Equal Employment Opportunity Commission to no avail and exhausted all required administrative procedures prior to filing this Complaint for Damages.

**V. Facts Common to All Counts**

8.      Plaintiff, S. Mirza, is a 27-year-old South Asian female, who worked for Defendant Company for approximately 2 years.

9.      Plaintiff was constructively discharged from her position as Sales Director on or about June 23, 2022.

10.      Plaintiff believes that this was due to the fact that she had raised issues regarding pay disparity between males and females in the same position, complained of discrimination and sexual harassment.

11.      Plaintiff started at Defendant Company on or about August 10, 2020.

12.      Plaintiff started with her responsibilities and region including 4 states (Kansas, Missouri, Iowa and Southern Illinois), which contained 8 law schools.

13.     During the course of Plaintiff's employment, this expanded to 5 states (including Oklahoma) and 3 additional law schools, totaling 11 law schools; Plaintiff was assigned one of the largest territories with one of the largest numbers of law schools in the country.

14.     Plaintiff supervised teams of representatives at each school totaling over 100 student representatives.

15.     Plaintiff supervised their training on materials and how to make sales.

16.     Plaintiff always worked extremely hard, frequently working past regular business hours, and focused on building relationships with leaders in the legal academic communities as well as establishing herself as a resource for her representatives and any law students.

17.     Plaintiff received praise from her direct leadership as well as rave reviews from students that she worked with during the course of their legal education and subsequent bar preparation.

18.     Plaintiff increased sales each year and took on additional roles outside of the immediate scope of her employment, such as, national course administration, creating training documents, helping train new hires, creating the concept of (and helping direct/film) motivational videos inputted into Defendant Company's outreach materials, as well as continuously working to help improve the course and its materials.

19.     In July of 2021, Plaintiff was working with an internal team dedicated to social media and Defendant Company's social media presence.

20.     Plaintiff's work involved collaboration with other directors, one being Eric Kang.

21.     Plaintiff and Eric worked together on social media ideas and frequently communicated about work.

22.     Eric Kang began to send Plaintiff messages via zoom, text and Instagram that made her feel uncomfortable as they were inappropriate in nature.

23.     These messages related to Plaintiff's appearance and sometimes occurred during work meetings.

24.     Plaintiff informed another member of the committee, Rebecca Petrilli about the communications of Mr. Kang and how it made Plaintiff uncomfortable and was instructed by Ms. Petrilli to send Mr. Kang a text message stating that he was making her uncomfortable and to stop.

25.     Rebecca Petrilli also informed the leader of the committee, Bobby Arnold.

26.     Plaintiff asked Rebecca Petrilli if she should report the interactions to HR, but Ms. Petrilli told Plaintiff that Defendant Company is very much a "boys club", and that it could negatively impact Plaintiff's employment.

27.     Rebecca further stated that the CEO of Defendant Company, Rich Douglas, liked Eric Kang as they knew each other in law school, and he had been at Defendant Company for a long time and that he would believe Mr. Kang and would likely make Plaintiff's life more difficult at the company.

28.     Rebecca Petrilli also said this was the culture of Defendant Company.

29.     Plaintiff did not report the interaction to HR and left the social media committee shortly thereafter.

30.     Plaintiff did bring her concerns about Mr. Kang's to her direct supervisor, Whitney Wright, a few weeks later.

31.     Plaintiff informed her that she had to ask Eric Kang to stop communicating with her in an unprofessional manner and commenting on her appearance as it made her uncomfortable.

32.     Ms. Wright did not ask Plaintiff for any further information.

33.     In a set of text messages, the week of June 6, 2022, Whitney Wright made jokes about the fact that Eric Kang was asking to come to a dinner they had planned and referred to Mr. Kang as, "your boy."

34.     Plaintiff told her that this made her uncomfortable.

35.     In February 2022, Plaintiff was working with the national course administration team.

36.     Part of Plaintiff's duties were to hire and train new contractors, and Plaintiff began working closely with a contractor, Annie Montgomery.

37.     Ms. Montgomery had applied and was interviewing for a position with Defendant Company and had called Plaintiff to speak about the process and ask for any advice.

38.     Ms. Montgomery informed Plaintiff that she told Defendant Company that she would not be able to move from her current position for anything under $80,000 a year and that the representative from Defendant Company told her that it was no problem as they hired someone in New Jersey for $80,000 and were doing the same for new hires coming in.

39.     Ms. Montgomery called Plaintiff to ask her about her salary, as Plaintiff had been there for almost two years, so she could get an idea about career progression and bonus.

40.     Plaintiff started at Defendant Company at $65,000 and received a $5,000 bonus in September 2021, bringing her salary to $70,000.

41.     This was the first time Plaintiff had been made aware of the pay inequity.

42.     The new hires, white males, with no experience were making $80,000.

43.     Plaintiff called her colleague, Kelsey Williams and apprised her of this information as she was the one to recommend Ms. Montgomery.

44.     Kelsey Williams was upset as she did not make much over $80,000 with almost 5 years-experience and she called Ms. Wright and asked her opinion on what to do.

45.     Ms. Montgomery used this information to go to Rich Douglas (CEO) and get a promotion and a raise.

46.     Ms. Wright called Plaintiff on or about February 14, 2022, and told Plaintiff that she knew that the new male hires were making more money because of her conversation with Kelsey Williams.

47.     Plaintiff told Plaintiff that she felt it was unfair that women were making less money as Plaintiff knew that the female hires brought on with her in 2020 were all making $70,000 and that Plaintiff, as a woman of color, was making much less that the white men brought on.

48.     Whitney agreed and told Plaintiff that she would speak to her supervisor, VP of Sales, Brian Sacks (white, male) about the issue.

49.     Whitney called Plaintiff back on or about February 15, and told Plaintiff that she spoke to Brian Sacks, and that she wanted Plaintiff to speak with him, and that he agreed that Plaintiff should be raised to $80,000 and that it was unfair that these new male hires were being paid more.

50.     Plaintiff spoke with Mr. Sacks on or about February 15 and let him know that she was upset that the male new hires were making more.

51.     Mr. Sacks praised Plaintiff's performance, validated Plaintiff's concerns, and told her that he would speak with the CEO when he returned from vacation the following week.

52.     Plaintiff sent him an email that following Sunday as a reminder to speak to the CEO.

53.     On or about February 22, Mr. Sacks notified Plaintiff that he had spoken to Rich Douglas (CEO) and that Mr. Douglas agreed with him and wanted to speak with Plaintiff.

54.     Plaintiff sent Mr. Douglas an email, on the 22nd, asking to speak, and he responded February 23, asking what Plaintiff needed to speak about.

55.     Plaintiff responded with what Mr. Sacks had said and they set a time to speak on February 28, at 3PM.

56.     Plaintiff spoke with Rich Douglas and he notified Plaintiff that there was no room for a salary increase at the time, and that employees should not be talking about salary as it causes issues.

57.     Mr. Douglas also told Plaintiff that he was aware of all of the work she had been doing and that it would be reflected in her bonus and potential raise, with conversations/performance reviews happening in October/November 2022 with actual payment in April 2023.

58.     Mr. Douglas made other comments, such as stating that Plaintiff had exceeded all expectations as they did not expect much from Plaintiff when she was brought on.

59.     Plaintiff told Mr. Douglas that she was concerned that women were being paid less and he brushed off Plaintiff's concerns and stated that the difference in pay was due to cost of living per region as well as experience.

60.     Plaintiff told him that she had looked up cost of living comparisons and he mockingly responded, "oh, you looked up cost of living, did you?"

61.     Mr. Douglas told Plaintiff that the New Jersey director was moving to downtown New York and that was why he needed to be paid more.

62.     Plaintiff also informed Mr. Douglas that both male new hires had 2-years-experience, the same as Plaintiff.

63.     Plaintiff asked him if she quit at Defendant Company whether she would be rehired at $80,000.

64.     Mr. Douglas was very dismissive of Plaintiff and told her that these conversations needed to happen closer to the bonus/merit raise timeline and that she should focus on working hard and remaining committed to Defendant Company and that she would eventually be promoted but that that time was not now.

65.     Plaintiff left the conversation feeling very discouraged and called Whitney Wright who seemed shocked that Mr. Douglas did not offer her more money as she was under the impression that he would do so based on her conversation with Brian.

66.     In early March 2022, Ms. Wright called Plaintiff and told her that Brian Sacks had spoken to Mr. Douglas and that they would be giving her a $5,000 raise for the time being.

67.     Plaintiff followed up with her weekly, and never received this raise.

68.     At the same time as Plaintiff's conversations with Mr. Douglas, she spoke with 2 seasoned female directors at Defendant Company, Kimberly Batrice and Yvette Edwards.

69.     Both essentially stated that this information was not new, and that Mr. Douglas does not like strong women, nor does he pay them well.

70.     They told Plaintiff that they assumed the reason she was not getting the money was because she is a woman.

71.     The phrase "because you don't have a dick and balls" was used by them during the conversation.

72.     Yvette Edwards also told Plaintiff that she has been saying they are discriminatory for many years against minorities and that she and Plaintiff were the only two women of color in the position of director for a reason.

73.     Yvette Edwards told Plaintiff to never disclose her partner's job or compensation as Defendant Company did not pay Yvette more because they were aware that her husband had a lucrative position and that they were making enough money.

74.     Yvette Edwards was very supportive and told Plaintiff that she knew she was being discriminated against for being a woman of color, that she had been saying this for years, that it was a consistent issue and that it was a problem.

75.     Kimberly Batrice told Plaintiff to think about all the people who had left the company in the last few months and realize that it was all women, and that Plaintiff needed to understand that Mr. Douglas does not like women who speak up.

76.     During the time between March and June, Whitney Wright would send Plaintiff text messages saying she was so upset that she was underpaid and that she deserved more.

77.     Plaintiff kept asking her for the extra $5,000 and she repeatedly told Plaintiff she was working on it.

78.     Plaintiff received a verbal offer from another company on June 8, 2022, and Plaintiff called Whitney Wright that night.

79.     Ms. Wright told Plaintiff that she should take the offer and reiterated that through text and Plaintiff told her that she wanted to stay at Defendant Company and wanted a counteroffer to stay.

80.     Ms. Wright told Plaintiff that she would call Mr. Sacks and then Mr. Douglas and get back to her.

81.     On June 9, 2002, Mr. Douglas emailed Plaintiff and told her he would like to get breakfast on the morning of June 14, 2022, and that he would like to convince her to stay with Defendant Company.

82.     Plaintiff flew to Chicago for the National Meeting on June 13, 2022.

83.     That night, she went to dinner with Melissa, Kelsey, Whitney and Yvette.

84.     After dinner, Plaintiff and Kelsey left and the remaining people went to a bar.

85.     Around 11PM, Plaintiff realized she did not bring a toothbrush and went to the lobby to get one.

86.     Plaintiff ran into Yvette Edwards and Mr. Sacks, and Yvette was crying about how Defendant Company and its employees are racist and that she was being treated differently on the basis of her race (black).

87.     Yvette Edwards stated that she was called aggressive and that referring to her as that was a stereotype used for black women and that she felt she was being discriminated against.

88.     On June 14, 2022, Plaintiff went to breakfast with Mr. Douglas.

89.     Plaintiff told him much of what she had said in their February conversation and highlighted that she was very discouraged that both new white male employees were performing poorly, and that Plaintiff was being asked to step in and fix their mistakes.

90.     Mr. Douglas asked Plaintiff how she knew this, and she replied that during her role in course administration one of her duties was to sept in if work was not being done and that she was stepping in to help due to their poor performance and their receipt of negative feedback from students and other directors.

91.     Plaintiff also told him that she was concerned as the perception was that the new male hires were being paid more than [similarly situated] women and that Plaintiff was a woman of color.

92.     Plaintiff specifically said that if a competitor found out, they would hire women of color and make it known that Defendant Company was racist and sexist.

93.     Mr. Douglas told Plaintiff that it was not their intent that this happened, but he could see how it looked.

94.     Mr. Douglas was more interested in speaking to Plaintiff about others than he was Plaintiff's situation.

95.     Mr. Douglas also spoke about Kimberly Batrice, who had since left to go to a competitor, and how he was friends with people in her new company and that they were telling him all the things she claimed she did at Defendant Company and how she was lying, and that it would come back to her and that Defendant Company was suing her and that "the trash takes itself out."

96.     This concerned Plaintiff deeply as Kimberly Batrice was at Mr. Douglas's wedding and was very close friends with his wife, Ellen Douglas, who is a VP at Defendant Company.

97.     Plaintiff believed this to be a veiled threat and felt that Mr. Douglas was telling Plaintiff that if she left, he would do the same to her.

98.     Plaintiff told Mr. Douglas how much money she needed to stay at Defendant Company and he told Plaintiff that he would speak to Jeff Elliot, the CFO of Defendant Company's new parent company (UWorld).

99.     Plaintiff asked him to highlight the fact that she had completed her MBA and that she was now more qualified than the male new hires [due to combined education and experience].

100.     Mr. Douglas stated that Plaintiff had most likely received her job offer due to being on a mailing list and that he would speak to Mr. Elliot and get back to her.

101.     After breakfast, Plaintiff went back to the conference and ran into Brian Sacks.

102.     They spoke about breakfast, and he told Plaintiff that he knew she felt discriminated against, but that that was never their [Company's] intent.

103.     Mr. Sacks also told Plaintiff that they were considering firing one of the new hires due to performance and he knew how much work Plaintiff had done over the period of course administration.

104.     That evening, dinner was at Mr. & Mrs. Douglas' country club, where Plaintiff spoke to Ellen Douglas and received praise, with Ms. Douglas stating that Plaintiff was a hard worker and phenomenal and that wherever she went would be lucky to have Plaintiff because she was so amazing.

105.     The morning of June 15, 2022, Plaintiff got a call from the prospective new company with an increase in their offer.

106.     Plaintiff texted Whitney Wright asking if she had any new information, and during one of the breaks at the conference, Plaintiff saw her speaking in a corner with Mr. Douglas and Mr. Sacks.

107.     At lunch, Whitney Wright pulled Plaintiff aside and let her know that Mr. Douglas had spoken with Jeff Elliot and that all they could do was offer her $80,000 (which is what they had recently hired the inexperienced white males at) which would go into effect in November of 2022, and that they were raising every other female who was at $70,000 to $80,000.

108.     Plaintiff expressed that she felt she had put herself at risk and that everyone else would benefit from it, as they should, but that Plaintiff was not getting anything she had asked for to stay.

109.     Whitney Wright told Plaintiff that she thought she should take the new offer and leave Defendant Company.

110.     Plaintiff told her that she did not want to leave Defendant Company and that she wanted to stay as she loved her job and her work with her students.

111.     At this point, Plaintiff became emotional and asked her what she should do, and if Whitney Wright really thought she should leave.

112.     Ms. Wright told Plaintiff that she should quit, right then, and pull out her phone and give notice and that she needed to change her flight and just leave the conference.

113.     Whitney Wright told her to cancel her flight for the next conference in Austin, and Plaintiff did.

114.     Ms. Wright sat beside Plaintiff and encouraged her to look up flights to see if she could leave earlier.

115.     Ms. Wright asked if she should get Brian Sacks [to help] and Plaintiff said yes because she thought he could help diffuse the situation.

116.     As Ms. Wright left, a co-worker, Kristin White, came up to Plaintiff and asked if she was okay.

117.     Plaintiff said that she was emotional as she had received another offer and wanted to stay at Defendant Company.

118.     At this point, Mr. Sacks came over and told Plaintiff that he hoped she would allow them two weeks' notice. Plaintiff had never given any notice and it was only Ms. Wright who was suggesting that she leave her employment.

119.     Plaintiff was very confused and stated that she did not want to leave Defendant Company.

120.     Ms. Wright told Plaintiff that she should make her last day in July so that she could keep health insurance coverage.

121.     Plaintiff was very emotional at this point because she could not understand why they were saying that she needed to leave.

122.     Plaintiff asked Mr. Sacks how she could go back into the afternoon session of the meeting as she looked like she had been crying, and he told Plaintiff that she did not need to.

123.     Plaintiff did not go to the afternoon session and instead went to the restaurant across the street.

124.     Plaintiff began receiving text messages from coworkers, and Kristin White texted Plaintiff asking her if she quit on the spot and left as that is what they were being told.

125.     Plaintiff responded that she did not quit and that she had not come back to the meeting as something had come up that she needed to handle.

126.     While Plaintiff was at the restaurant, Yvette Edwards came once the meeting had finished and asked Plaintiff if she had quit.

127.     Plaintiff once again stated that she had not quit.

128.     Another coworker, Rahul Agarwal, came to the restaurant and told Plaintiff he had heard the news and was sad that she was leaving.

129.     Plaintiff asked him what news he was talking about, and he told Plaintiff that Whitney Wright had called him and told him she had quit on the spot and was leaving.

130.     Plaintiff told him that this was not true, that she had not quit, and that she was confused as to what was happening.

131.     Mr. Douglas texted Plaintiff at approximately 4PM stating that he had heard "the news" and that he wanted to speak to Plaintiff the next morning.

132.     Plaintiff told him she was happy to speak to him the next morning.

133.     After this, Whitney Wright called Plaintiff and told her that she had told Mr. Douglas and Mr. Sacks that she had quit.

134.     Plaintiff asked her why she did this and she stated that she understood that Plaintiff had given notice while she was emotional.

135.     Plaintiff reiterated to her that she did not give notice and that she had not submitted anything in writing.

136.     Whitney Wright stated that she could have been hungover from the night before and misunderstood.

137.     Plaintiff reiterated to her in text messages that night that she did not quit.

138.     The next morning, June 16, 2022, at 10AM, Plaintiff had a Google Meet with Mr. Douglas where she told him that she did not quit.

139.     Mr. Douglas accepted this and said it was probably a misunderstanding and that he would get back to her once he heard from Jeff Elliot and said that Plaintiff was fine and should continue working as usual.

140.     Mr. Douglas sent Plaintiff a text message that afternoon at 4PM and asked to get on another Google Meet as he spoke with Jeff Elliot.

141.     Mr. Douglas got on the Google Meet with Whitney Wright and told Plaintiff that Jeff Elliot said that Plaintiff could get a bump up to $80,000, that everyone paid less than the men would be brought up to $80,000 and that there was nothing else they could do.

142.     Plaintiff asked whether if she were to leave if they would be willing to pay out her bonus as it is based on sales for the past academic year, and he said he would if Plaintiff stayed till the end of July.

143.     Plaintiff said she would speak to her partner and that she would get back to them the following week.

144.     Mr. Douglas asked for an answer by Monday June 20, 2022, and Plaintiff asked him for until Wednesday June 22, 2022.

145.     Mr. Douglas said that was fine.

146.     Whitney Wright and Plaintiff communicated after via text message and she reiterated that Plaintiff needed to leave and take an offer for more money, and Plaintiff reiterated that she did not want to leave Defendant Company.

147.     Plaintiff spoke to Whitney Wright Friday night and asked her if their working relationship would move forward if she stayed, as she had told the entire company that she had quit when she did not.

148.     Ms. Wright told Plaintiff that she felt like Plaintiff had put her job in jeopardy in the process of what had happened, and she was not sure that she could move on.

149.     The following week, Plaintiff started to feel sick, and an email was received from Mr. Douglas saying that someone at the conference had tested positive for COVID-19.

150.     Plaintiff took a half day on Monday as she did not feel well and told Mr. Wright via text that she had not yet made a decision, but that she was leaning towards staying at Defendant Company.

151.     Tuesday night, Ms. Wright texted Plaintiff for an update, and Plaintiff told her to tell Mr. Douglas that she needed more time as she had not yet had a chance to speak with her partner and was feeling very ill.

152.     Ms. Wright stated that she would, and Plaintiff assumed she had communicated her request to Mr. Douglas when she did not hear back on Wednesday.

153.     Thursday afternoon, Plaintiff received an email from Mr. Douglas where he stated that her lack of response had endangered their company and jeopardized the 12,000+ students who relied on Defendant Company for bar preparation.

154.     Plaintiff was shocked by this and felt like she did not have any other choice than to resign.

155.     Plaintiff's resignation stated that her last day would be July 8, 2022.

156.     Mr. Douglas responded to accept Plaintiff's resignation and stated that he had given her time after she had first resigned and then had taken it back, at which time he looped in HR.

157.     Plaintiff took PTO on that Friday and for the following week, as she had enough PTO days and was feeling extremely distressed by the situation.

158.     On Friday, Plaintiff went to the doctor and was prescribed anti-anxiety medication.

159.     Friday night, Plaintiff received an email from HR to Plaintiff's personal email asking to meet.

160.     Plaintiff let HR know that she was unable to meet, as she was on PTO, and Monday at 5PM Plaintiff's email access was shut down.

161.     Plaintiff has experienced, is now experiencing, and will continue to experience into the indefinite future, garden variety emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses as a direct result of Defendant Company's conduct.

162.     Plaintiff has suffered and will continue to suffer future pecuniary losses as a direct result of Defendant Company's conduct.

163.     Defendant Company and its managers and other employees actively engaged in discrimination against Plaintiff with malice or in reckless indifference to her right to be free from such discrimination under Title VII of the Civil Rights Act of 1964 (as amended) and the Equal Pay Act.

## VI. Causes of Action

### COUNT I – EQUAL PAY ACT

164.     Plaintiff restates and realleges paragraphs 1-163 of this Complaint.

165.     At all relevant times, Defendants were an employer covered by and within the meaning of the Equal Pay Act.

166.     Defendants discriminated against Plaintiff by providing her with lower pay than similarly situated white male sales representatives in the same position as Plaintiff, even though Plaintiff was performing similar duties requiring the same skill, effort, and responsibility of male employees.

167.     Plaintiff and similarly situated male employees all perform similar job duties and functions requiring the same skill, effort, and responsibilities, and/or were performing under similar working conditions.

168.     The difference in pay between male and female employees was not due to seniority, merit, quantity of quality of production, or a factor other than sex.

169.     Defendants caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on gender, in violation of the EPA.

170.      The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255.

171.     As a result of Defendants' conduct, Plaintiff suffered and continues to suffer harm including but not limited to:  lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

172.     By reason of Defendants' discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the EPA including liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216.

## COUNT II – GENDER DISCRIMINATION

173.     Plaintiff restates and realleges paragraphs 1-172 of this Complaint.

174.     At all relevant times, Defendants were an employer covered by and within the meaning of the Civil Rights Act of 1964.

175.     Plaintiff's gender was a motivating factor in Defendants' wrongful discriminatory treatment described and set forth above.

176.     Defendants and their agents, representatives and employees were predisposed to discriminate on the basis of gender and acted in accordance with that predisposition.

177.     Defendants' actions were intentional with reckless indifference to Plaintiff's rights and sensibilities.

178.     Defendants and their agents, representatives and employees treated Plaintiff differently than similarly situated employees based on unlawful consideration of gender.

179.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff has sustained injuries and damages.  These include but are not limited to the following: past and future wage loss; past and future lost earning capacity; past and future loss of fringe benefits; loss of career opportunities; physical pain and suffering; shame, humiliation, embarrassment, anxiety, loss of sleep and interference with her enjoyment of life; and emotional distress, all of which will continue into the future.

180.     All of the actions of Defendants were intentional, careless and/or reckless and performed in complete disregard of the law and the rights of Plaintiff, for which conduct and actions, punitive damages are properly imposed in such amounts as will punish Defendants for their wrongful conduct and deter it and others from like conduct in the future.

**COUNT III – RACE AND/OR NATIONAL ORIGIN**

181.     Plaintiff restates and realleges paragraphs 1-180 of this Complaint.

182.     At all relevant times, Defendants were an employer covered by and within the meaning of the Civil Rights Act of 1964.

183.     Plaintiff's race (South Asian) and/or National Origin (Pakistan) was a motivating factor in Defendants' wrongful discriminatory treatment described and set forth above.

184.     Defendants and their agents, representatives and employees were predisposed to discriminate on the basis of race and/or nation origin as compared to similarly situated Caucasian and/or native-born citizens of the United States and acted in accordance with that predisposition in the terms, conditions and pay of its employees.

185.     Defendants' actions were intentional with reckless indifference to Plaintiff's rights and sensibilities.

186.     Defendants and their agents, representatives and employees treated Plaintiff differently than similarly situated employees based on unlawful consideration of race and/or national origin.

187.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff has sustained injuries and damages.  These include but are not limited to the following: past and future wage loss; past and future lost earning capacity; past and future loss of fringe benefits; loss of career opportunities; physical pain and suffering; shame, humiliation, embarrassment, anxiety, loss of sleep and interference with her enjoyment of life; and emotional distress, all of which will continue into the future.

188.     All of the actions of Defendants were intentional, careless and/or reckless and performed in complete disregard of the law and the rights of Plaintiff, for which conduct and actions, punitive damages are properly imposed in such amounts as will punish Defendants for their wrongful conduct and deter it and others from like conduct in the future.

### COUNT IV - SEXUAL HARASSMENT / HOSTILE WORK ENVIRONMENT

189.     Plaintiff restates and realleges paragraphs 1-188 of this Complaint.

190.     At all relevant times, Defendants were an employer covered by and within the meaning of the Civil Rights Act of 1964.

191.     Plaintiff's sex and/or gender was a motivating factor in Defendants' wrongful discriminatory treatment described and set forth above.

192.     Defendants and their agents, representatives and employees were predisposed to discriminate on the basis of Plaintiff's sex and acted in accordance with that predisposition in the terms and conditions of her employment.

193.     Plaintiff was subjected to unwanted sexual harassment in the form of texts, messages and comments made by Eric Kang which affected the terms and conditions of Plaintiff's employment.

194.     Plaintiff informed her supervisor and management at Defendant of her complaints of receiving unwanted sexual harassment and/or sexually hostile work environment in the form of texts, communication and direct comments.

195.     Plaintiff was also subjected to a sexually hostile work environment based upon the actions of Eric Kang and the response of management to her complaints of unwanted sexual harassment as set forth above.

196.     Defendants' actions were intentional with reckless indifference to Plaintiff's rights and sensibilities.

197.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff has sustained injuries and damages.  These include but are not limited to the following: past and future wage loss; past and future lost earning capacity; past and future loss of fringe benefits; loss of career opportunities; physical pain and suffering; shame, humiliation, embarrassment, anxiety, loss of sleep and interference with her enjoyment of life; and emotional distress, all of which will continue into the future.

198.     All of the actions of Defendants were intentional, careless and/or reckless and performed in complete disregard of the law and the rights of Plaintiff, for which conduct and

actions, punitive damages are properly imposed in such amounts as will punish Defendants for their wrongful conduct and deter it and others from like conduct in the future.

## COUNT V – RELIGIOIUS DISCRIMINATION

199.     Plaintiff restates and realleges paragraphs 1-198 of this Complaint.

200.     At all relevant times, Defendants were an employer covered by and within the meaning of the Civil Rights Act of 1964.

201.     Plaintiff's religion was a motivating factor in Defendants' wrongful discriminatory treatment described and set forth above.

202.     Defendants and their agents, representatives and employees were predisposed to discriminate on the basis of her being a Muslim (follower of Islam) and acted in accordance with that predisposition as compared to other employee who were not followers of the Islamic faith.

203.     Defendants' actions were intentional with reckless indifference to Plaintiff's rights and sensibilities.

204.     Defendants and their agents, representatives and employees treated Plaintiff differently than similarly situated employees based on unlawful consideration of religion.

205.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff has sustained injuries and damages.  These include, but are not limited to, the following: past and future wage loss; past and future lost earning capacity; past and future loss of fringe benefits; loss of career opportunities; physical pain and suffering; shame, humiliation, embarrassment, anxiety, loss of sleep and interference with her enjoyment of life; and emotional distress, all of which will continue into the future.

206.     All of the actions of Defendants were intentional, careless and/or reckless and performed in complete disregard of the law and the rights of Plaintiff, for which conduct and

actions, punitive damages are properly imposed in such amounts as will punish Defendants for their wrongful conduct and deter it and others from like conduct in the future.

## COUNT VI – RETALIATION

207.     Plaintiff restates and realleges paragraphs 1-206 of this Complaint.

208.     At all relevant times, Defendants were an employer covered by and within the meaning of the Civil Rights Act of 1964 and subject to the Equal Pay Act.

209.     Plaintiff engaged in the protected activity of reporting to her supervisor and/or management what she believed were acts of sexual harassment, creation of a sexually hostile work environment, pay discrimination based upon gender and/or race, national origin and/or religion in violation of Title VII, and violations of the Equal Pay Act.

210.     Plaintiff's complaints about Defendants discriminatory conduct was a motivating factor in Defendants' wrongful discriminatory treatment described and set forth above which eventually led to her termination/constructive discharge.

211.     Defendants' actions were intentional with reckless indifference to Plaintiff's rights and sensibilities.

212.     Defendants and their agents, representatives and employees treated Plaintiff differently than similarly situated employees based on unlawful consideration of gender, race, and national origin.

213.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff has sustained injuries and damages.  These include, but are not limited to, the following: past and future wage loss; past and future lost earning capacity; past and future loss of fringe benefits; loss of career opportunities; physical pain and suffering; shame, humiliation, embarrassment, anxiety,

loss of sleep and interference with her enjoyment of life; and emotional distress, all of which will continue into the future.

214.     All of the actions of Defendants were intentional, careless and/or reckless and performed in complete disregard of the law and the rights of Plaintiff, for which conduct and actions, punitive damages are properly imposed in such amounts as will punish Defendants for their wrongful conduct and deter it and others from like conduct in the future.

**VII. Prayer for Relief**

215.     Wherefore, Plaintiff prays that this Court:

    a.   declare the conduct engaged in by Defendant Company to be in violation of Plaintiff's rights;

    b.   enjoin Defendant, and its managers/supervisors from engaging in such conduct;

    c.   restore Plaintiff to her rightful position with Defendant or, in lieu of reinstatement, order front salary and benefits for the period remaining until normal retirement;

    d.   award Plaintiff equitable relief of back salary and fringe benefits up to the date of reinstatement and prejudgment interest for that entire period or front salary and benefits accrual;

    e.   award Plaintiff compensatory, punitive and liquidated damages against Defendant Company;

    f.   award Plaintiff damages for emotional pain and suffering;

    g.   award Plaintiff his costs and attorneys' fees; and

    h.   grant such other relief as it may deem just and proper.

## <u>DEMAND FOR A JURY TRIAL & LOCATION OF TRIAL</u>

Plaintiff demands trial by jury on all issues triable by a jury in this complaint and that the trial be

held in the Federal District Court of Kansas located in Kansas City, Kansas.


Respectfully submitted,

By: /s/ *Kevin Baldwin*

Kevin Baldwin, KS Bar No. #18637
Eric Vernon, KS Bar No. #21358
Sylvia Hernandez, KS Bar No. #78914
**BALDWIN & VERNON**
108 S Pleasant St.
Independence, MO 64050
Tel: (816) 842-1102
Fax (816) 842-1104
Kevin@bvalaw.net
Eric@bvalaw.net
Sylvia@bvalaw.net

ATTORNEYS FOR PLAINTIFF