IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

S. MIRZA,

        *Plaintiff*,

v.

UWORLD, LLC, d/b/a
THEMIS BAR REVIEW,

        *Defendant*.

Case No. 23-CV-2208-EFM

**MEMORANDUM AND ORDER**

Before the Court is Defendant UWorld, LLC's Motion for Summary Judgment (Doc. 40). Defendant seeks summary judgment on all of Plaintiff S. Mirza's remaining claims, including her Equal Pay Act ("EPA") claim, gender discrimination claim, race discrimination claim, and sexually hostile work environment claim. For the reasons stated below, this Court finds that no genuine disputes exist, and Defendant is entitled to judgment as a matter of law. Accordingly, the Court grants Defendant's motion.

**I.    Factual and Procedural Background[1]**

Plaintiff is a South Asian female of Pakistani descent. Defendant sells, among other things, Bar Review materials to law schools and law students. After graduating from law school, Plaintiff began working for Defendant on August 10, 2020, as a sales director based out of Kansas City,

---

[1] The facts are those uncontroverted by the parties unless otherwise cited.

Kansas.[2] As a sales director, Plaintiff was responsible for being present at law schools; administering the bar course; selling courses directly to students; facilitating relationships with faculty administrators at the law schools to encourage purchase of Themis Bar Review materials; and hiring, training, and motivating law school representatives.

Defendant has written policies prohibiting harassment and discrimination based on sex, national origin, and race, among other protected characteristics. Plaintiff was aware of these policies and understood them. Defendant also has a written open-door policy to encourage candid communication between employees. Plaintiff was instructed to report any suspected harassment or retaliation to a supervisor above her or Human Resources.

Plaintiff's starting base salary was $65,000, and she received a $5,000 bonus in her first year. Additionally, Plaintiff was also paid a $3,250 relocation bonus, which she was not asked to repay even though she never relocated. In 2021, Defendant increased Plaintiff's base salary to $70,000. Around the same time Defendant hired Plaintiff, it hired four other sales directors—Taylor Williams, Simon Kimmelman, Heather Miller, and Winter Vega. Williams, Kimmelman, and Miller are white females who received a base salary of $65,000. Vega is either a white or Hispanic female[3] who received a base salary of $70,000 because she was located in New York City.

On or about September 10, 2020, Eric Kang, a fellow sales director, sent Plaintiff a picture of a poster Defendant previously displayed in the office. The poster contained a nude image of a man with a package over his genitalia, promoting Defendant's bar review package. Plaintiff did not report this incident to Human Resources.

---

[2] Effective January 2020, Defendant UWorld's ownership group acquired Themis Bar Review. This Order refers to the entities collectively as "Defendant" unless otherwise specified.

[3] The record is unclear as to Vega's ethnicity.

In March 2021, Plaintiff joined Defendant's social media committee. The social media committee was composed of two sales directors and a senior marketing manager. One of the sales directors on the social media committee was Eric Kang.

In May 2021, the members of the social media committee met up for drinks at a hotel and then went to a restaurant for dinner. When Plaintiff called an Uber to take her back to the hotel, Kang got up and told her, "You should really stay out with us." During this interaction, Kang rubbed Plaintiff's back and positioned himself between Plaintiff and the exit. Plaintiff told Kang to stop and left the restaurant. Plaintiff did not report this incident to Human Resources.

Plaintiff did not get "really . . . concerned" about Kang's behavior until he made comments about her appearance in July 2021. On July 6, 2021, Kang asked Plaintiff if she was using a filter, to which Plaintiff replied that she was not. Then, Kang said that she looked "glowing." Plaintiff made a joke about being pregnant and then thanked him for his comment about her appearance. Kang did not reply to her message. Two days later, Plaintiff initiated the next text conversation with Kang by sending him a Tiktok video. On July 26, 2021, Kang told Plaintiff she looked "dazzling," and Plaintiff responded, "Eric, you are my personal hype man, honestly."

Over the next week, one of Plaintiff's peers encouraged Plaintiff to tell Kang to stop messaging her about her appearance. Plaintiff replied to the peer, stating things like: "he is nice," "he's just trying to hype me up as the new girl," "I honestly just thought it was him being awkward because he doesn't know how to talk to women," "he's just nervous; wants a new friend," "I never considered it weird," and "I don't see the harm."

Ultimately, however, Plaintiff messaged Kang on August 3, 2021, and said, "it makes me uncomfortable when you comment on my appearance, and I'd appreciate if you refrain from doing that in the future." Kang apologized and said "OMG, I'm sorry, so sorry," and promised never to

comment again. Kang never commented again on Plaintiff's appearance, and never said or did anything further that made her uncomfortable. Kang and Plaintiff continued to work together without issue.

Plaintiff first developed concerns about pay equity in February 2022. Plaintiff discovered that Defendant recently hired Robert Galvan, a white male, in Plaintiff's same position, for the New York area at a starting salary of $80,000. Additionally, Defendant hired three other sales directors in early 2022. Defendant hired Adam Wall, a white male, and Chris An, an Asian male, who were both based out of Washington, D.C. Defendant also hired Michele Cooley, a white female, who was based out of Indianapolis. Each of the 2022 hires had several years of legal experience post-law school, although to varying degrees. All four of these 2022 hires were paid a starting salary of $80,000.

On February 15, 2022, Plaintiff reached out to Brian Sacks, Vice President of Sales, about compensation. She told him she believed it was unfair that Robert Galvan was making more than her. By the end of their conversation, Sacks told Plaintiff that he would try to secure a $5,000 raise for her.

On February 22, 2022, Plaintiff reached out to Richard Douglas, Defendant's Chief Operating Officer ("COO"), to request a meeting with him regarding compensation. On February 28, 2022, Plaintiff and Douglas met over videochat. During the meeting, Douglas mentioned cost of living and experience as factors with the new hires. He explained that Defendant did not have the budget to offer bonuses and raises in February 2022, but that raises and bonuses would come in time, according to the normal pay cycle. After meeting with Douglas, Plaintiff decided it was a good time to start applying for other jobs and started actively exploring options to leave Defendant's employment.

On June 8, 2022, Plaintiff received a verbal offer of outside employment. Plaintiff told her supervisor about the offer and asked if Defendant planned to increase her salary by $5,000. The following day, Douglas emailed Plaintiff about the job offer. In his email, Douglas advised Plaintiff that he valued her as an employee and told her that he wanted to speak with her about continuing to work for Defendant. Plaintiff met with Douglas and told him that she needed around $85,000 to keep working for Defendant. Douglas suggested that her request was not impossible, but he would need to speak with upper management. The following morning, Plaintiff received a counteroffer of a $90,000 base salary from the prospective employer.

On June 16, 2022, Plaintiff again spoke with Douglas, who said that Defendant was willing to immediately offer her a $80,000 salary to stay—the salary offered to the 2022 sales directors. Plaintiff asked for time to consider whether to stay or accept an offer to work elsewhere. Douglas told Plaintiff he needed a decision by June 22, 2022. Plaintiff did not communicate a decision by that deadline.

On June 23, 2022, Douglas reached out to Plaintiff by email and told her that he needed a decision that day. When Plaintiff responded to the email, she tendered her resignation. Plaintiff did not raise any equal employment opportunity concerns or questions to Human Resources before she resigned.

On May 8, 2023, Plaintiff filed suit against Defendant. In Count I, Plaintiff claims that Defendant violated the EPA. In Count II, Plaintiff alleges that Defendant discriminated against her based on her gender. In Count III, Plaintiff contends that Defendant discriminated against her based on her race. Lastly, in Count IV, Plaintiff complains that Defendant subjected her to a sexually hostile work environment. Defendant filed this Motion for Summary Judgment on April 4, 2024. These matters have been fully briefed and are now ripe for the Court's ruling.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[4] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[5] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[6] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[7] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits— conclusory allegations alone cannot survive a motion for summary judgment.[8] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[9]

## III.     Analysis

### A.     Plaintiff's Equal Pay Act claim

In Count I, Plaintiff claims that Defendant discriminated against her by paying her less than similarly situated white males in the same position even though she was performing similar duties requiring the same skill, effort, and responsibilities.

EPA claims are evaluated under a two-step process. First, the plaintiff must demonstrate a prima facie claim of unequal pay by establishing: (1) she was performing work which was

---

[4] Fed. R. Civ. P. 56(a).

[5] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[6] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[8] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[9] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

substantially equal to that of employees of the opposite sex, considering the skills, duties, supervision, effort, and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; and (3) employees of the opposite sex were paid more under such circumstances.[10] If the plaintiff can establish a prima facie case, then the burden shifts to the defendant to justify the wage disparity based on one of four reasons: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."[11]

Defendant only challenges the second element of Plaintiff's EPA claim. Specifically, Defendant argues that Plaintiff cannot prove that she worked under similar conditions as Defendant's male employees. To support its proposition, Defendant claims that Plaintiff worked in Kansas City, a location with a significantly lower cost-of-living compared to where the male employees worked, New York City and Washington D.C.

The EPA prohibits different wages for men and women "within any establishment."[12] In this context, "establishment" has been interpreted to mean a distinct physical place of business, not an entire business which may include several separate places of business.[13] However, Plaintiff cites *Brownlee v. Gay & Taylor, Inc.*,[14] which carved out an exception to this general rule. *Brownlee* held that "where central supervision exists and where pay standards apply for an entire

---

[10] *Nazinitsky v. Integris Baptist Med. Ctr., Inc.*, 852 F. App'x 365, 367 (10th Cir. 2021) (citing *Riser v. QEP Energy*, 776 F.3d 1191, 1196 (10th Cir. 2015)).

[11] *Id.*

[12] *See* 29 U.S.C. § 206(d)(1).

[13] *Spiers v. McNeil Real Est. Mgmt.*, 1994 WL 476300, at *5 (D. Kan. Aug. 30, 1994) (citing *Mitchell v. Bekins Van & Storage*, 352 U.S. 1027 (1957)).

[14] 642 F. Supp. 347 (D. Kan. 1985).

business entity regardless of where the employee is located, individuals should be compared on the basis of their employment function and not geographic location."[15]

But *Brownlee* also held that when an employer has not "adopted a uniform, nongeographic pay policy and system," geographic-related factors "do affect the amount of salary paid to an individual working in that geographic location."[16] Specifically,

> the cost-of-living index would properly be considered as a factor for different salaries in cities with differing cost-of-living indices. Some cities may be considered hardship areas, while others may be more attractive places to live. Some cities require greater time and distance in traveling to and from work. Where [conditions] such as these logically affect the salary one should receive in a particular geographic area, there is reason to have differentials in salary scales based on geographic location.[17]

Here, Plaintiff has presented no evidence that Defendant runs its business through central supervision and applies uniform pay standards, applicable to all employees, regardless of geographic location. To the contrary, the evidence before the Court suggests that Defendant has not adopted a uniform pay standard and instead bases its salary rates with geographic locations in mind. Because no genuine dispute exists regarding Defendant's pay structure, geographic location is a legitimate basis for Defendant's differential salary scales under the EPA. Moreover, Plaintiff does not dispute that she worked in a location with a significantly lower cost-of-living, and that the male employees lived in cities with higher cost-of-living. Therefore, because different cost-of-living indices create dissimilar "working conditions," Plaintiff fails to establish a prima facie EPA claim. Accordingly, Defendant is entitled to summary judgment on Count I.

---

[15] *Id.* at 352.

[16] *Id.* (emphasis omitted).

[17] *Id.*

**B.      Plaintiff's discrimination claims**

In Counts II and III, Plaintiff claims that Defendant violated Title VII by treating her differently in the terms, conditions, and pay of her employment than other similarly situated employees based on her gender and race. For gender and race discrimination cases brought under Title VII, the plaintiff bears the ultimate burden of proving that her employer intentionally discriminated against her.[18] A plaintiff can prove a Title VII violation either by direct evidence of discrimination or by circumstantial evidence under the *McDonnell Douglas* burden-shifting framework.[19]

"Direct evidence of discriminatory animus is rare. If believed, direct evidence proves the existence of a fact in issue without inference or presumption, such as an employer's facially discriminatory policy or an oral or written statement showing a discriminatory motive."[20] Here, Plaintiff provides no analysis of direct evidence of discrimination and skips straight to the *McDonnell Douglas* framework. Thus, the Court concludes that Plaintiff has not met her burden of presenting direct evidence and will only evaluate whether she has presented sufficient circumstantial evidence under the *McDonnell Douglas* framework.

The *McDonnell Douglas* framework has three parts. First, the plaintiff must establish a prima facie case by a preponderance of the evidence.[21] Second, if the plaintiff makes out a prima facie case, the burden shifts to the employer to assert a legitimate nondiscriminatory reason for its

---

[18] *Bennett v. Windstream Communs., Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015).

[19] *Brown v. Titan Prot. & Consulting*, 2022 WL 1014154, at *2 (10th Cir. Apr. 5, 2022).

[20] *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 678 (10th Cir. 2021) (cleaned up).

[21] *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000).

actions.²² Third, if the employer does so, the burden shifts back to the plaintiff to introduce evidence that the stated nondiscriminatory reason is merely a pretext.²³

### 1.     *Prima facie case*

To prove a prima facie case of discrimination, the plaintiff must establish that "(1) [s]he is a member of a protected class, (2) [s]he suffered an adverse employment action, (3) [s]he qualified for the position at issue, and (4) [s]he was treated less favorably than others not in the protected class."²⁴ Defendant only contests the second element.

Defendant argues that because Plaintiff was not constructively discharged, she did not suffer an adverse employment action. Plaintiff argues, however, that she was not only constructively discharged but also suffered various other adverse employment actions in light of the Supreme Court's decision in *Muldrow v. City of St. Louis*.²⁵

Even before *Muldrow*, the Tenth Circuit liberally defined the phrase "adverse employment action."²⁶ Specifically, it held that an employer's "[c]onduct rises to the level of adverse employment action when it constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits."²⁷ But the Supreme Court held in *Muldrow* that Title VII contains no requirement that an adverse employment action result in "significant" harm.²⁸ Doing

---

²² *Mann v. XPO Logistics Freight, Inc.*, 819 F. App'x 585, 595 (10th Cir. 2020).

²³ *Id.*

²⁴ *Lopez v. Compa Indus.*, 2024 WL 3518015, at *2 (10th Cir. July 24, 2024) (citing *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012)).

²⁵ 144 S. Ct. 967, 974 (2024).

²⁶ *Neri v. Bd. of Educ.*, 860 F. App'x 556, 565 (10th Cir. 2021).

²⁷ *Id.* (emphasis added) (quoting *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003)).

²⁸ *Muldrow*, 144 S. Ct. at 976–77.

so would "impose a new requirement on a Title VII claimant, so that the law as applied demands something more of her than the law as written."[29] Thus, the Supreme Court effectively overruled the Tenth Circuit's interpretation that an adverse employment action must constitute a "significant" change.[30]

Nevertheless, *Muldrow* still requires "some disadvantageous change in an employment term or condition" or "some harm respecting an identifiable term or condition of employment."[31] And so—even without importing the significance requirement into the definition of adverse—"a mere inconvenience or an alteration of job responsibilities does not qualify."[32] That is, "[n]ot everything that makes an employee unhappy is an actionable adverse action."[33] Thus, the Court will evaluate each of Plaintiff's purported adverse employment actions to determine whether she has established a prima facie case of discrimination.

      a.    Coworker's comments

First, Plaintiff argues that she, as a woman, was subject to additional requirements or conditions of her employment that her male counterparts were not. In support, Plaintiff states that her job required her to maintain a certain physical appearance, including dressing like a woman and not gaining weight. However, Plaintiff presents no admissible evidence to support these allegations. Rather, Plaintiff's only basis for these "additional employment requirements" is that

---

[29] *Id.* at 974.

[30] *Id.* at 972 ("Other courts have used similar ['significance'] standards in addressing Title VII suits arising from job transfers. Today, we disapprove that approach. Although an employee must show some harm . . . to prevail in a Title VII suit, she need not show that the injury satisfies a significance test.").

[31] *Id.* at 974 (further quotation marks and citation omitted).

[32] *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1222 (10th Cir. 2022) (internal quotation marks and citation omitted).

[33] *Braxton v. Nortek Air Sols., LLC*, 769 F. App'x 600, 604 (10th Cir. 2019) (internal citation and quotation marks omitted).

she was told about a conversation between her director and Defendant's CEO—in other words, hearsay within hearsay. Plaintiff has not offered any legal argument or authority that a hearsay exception applies, and thus, the Court cannot consider at the summary judgment stage.[34] Accordingly, without any evidence that these conditions were actually imposed upon Plaintiff, these unverified comments cannot qualify as an adverse employment action.

Next, Plaintiff claims that one of her peers asked her if she was going bald. Although this comment may be socially inappropriate, Plaintiff has presented no evidence that it disadvantageously changed any of her employment terms. Thus, it cannot qualify as an adverse employment action. Additionally, this comment was not gender specific, as both males and females are subject to hair loss, so it cannot serve as evidence that Plaintiff was treated less favorably than male employees.

Plaintiff also claims that a peer told her "not to sleep with students" because she wouldn't be able to "get away with it" like a man would. Again, Plaintiff fails to identify a hearsay exception, and thus, the Court cannot rely on this statement for hearsay reasons. Moreover, this comment came from a peer—not from any individual in management or with decision-making authority. As such, the comment had no binding effect on Plaintiff's employment. Further, Plaintiff fails to explain why this comment disadvantageously changed any terms of her employment. For all these reasons, this comment fails to qualify as an adverse employment action.

Finally, Plaintiff claims that during a text conversation with a peer about properly pronouncing ethnic names, the peer told Plaintiff that she was being "too sensitive." But again,

---

[34] *Lincoln v. BNSF Ry. Co.*, 2020 WL 4000912, at *12 (D. Kan. July 15, 2020) ("[A]t summary judgment courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form. And, a party can't use inadmissible hearsay to survive a summary judgment motion because a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill." (further citations and quotations omitted)).

this comment was made by a peer—not an authority figure working for Defendant. Thus, Plaintiff fails to provide evidence that the comment disadvantageously changed any term of her employment. Consequently, this comment fails to qualify as an adverse employment action.

      b.      Constructive discharge

Next, Plaintiff claims that because Defendant constructively discharged her, she suffered an adverse employment action. While "[p]roof of constructive discharge satisfies the adverse employment action requirement[,] [c]onstructive discharge is not proven easily."[35] To demonstrate her resignation was involuntary, Plaintiff bears a "substantial" burden to show that Defendant, "by unlawful acts, made her working conditions so intolerable that a reasonable employee in her position also would have felt forced to quit."[36] "The law expects employees to tolerate merely difficult or unpleasant working conditions."[37] Only conduct that makes it "nearly impossible for [the employee] to continue performing her job" can amount to constructive discharge.[38] "Intolerability is an objective standard, so a plaintiff's subjective view of the work condition is irrelevant."[39]

After Plaintiff learned that Galvan was hired at a higher starting salary than her current salary, she decided to start applying for other jobs. She told Defendant that she would only consider staying if it could offer her a higher salary than the $90,000 outside salary offer she received. Ultimately, Defendant could not meet her demands, but it did offer her a salary of $80,000—the

---

[35] *Steele v. City of Topeka*, 189 F. Supp. 3d 1152, 1160 (D. Kan. 2016).

[36] *Id.* at 160–161.

[37] *Id.* at 161 (further citations and quotations omitted).

[38] *Id.*

[39] *Beck v. Figeac Aero N. Am., Inc.*, 382 F. Supp. 3d 1170, 1178 (D. Kan. 2019).

same amount that the 2022 hires had been offered. Plaintiff did not respond to the offer for a week. When Defendant followed up and asked for her decision, Plaintiff resigned.

"An employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged."[40] Likewise, an employee who quits because her employer cannot meet her compensation demands is not constructively discharged.[41] Although not obtaining a $20,000 pay raise may have been "difficult or unpleasant," it certainly did not make it "nearly impossible" for Plaintiff to continue performing her job. Based on the evidence presented, no reasonable employee in Plaintiff's position would have felt forced to quit. As such, the Court finds that Plaintiff fails to prove constructive discharge, and thus fails to demonstrate an adverse employment action.

        c.      Compensation discrimination

Lastly, Plaintiff claims that she suffered an adverse employment action because white male employees were paid a higher salary than her. Compensation discrimination can be an adverse employment action under Title VII, but only if the discrimination is based on "race, color, religion, sex, or national origin."[42] Compensation discrimination becomes apparent when an employer pays different wages or provides different benefits to similarly situated employees."[43] Accordingly, for

---

[40] *Martinez v. Southwest Cheese Co., LLC*, 618 F. App'x 349, 355 (10th Cir. 2015) (quoting *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir. 1995)).

[41] *See Colter v. Dobski & Assocs.*, 35 F. Supp. 2d 824, 831 (D. Kan. 1999) (holding that defendant's refusal to increase plaintiff's salary did not rise to the level of "intolerable working conditions" required for constructive discharge).

[42] *Gardenhire v. Manville*, 722 F. App'x 835, 842 (10th Cir. 2018).

[43] *Daniels v. UPS*, 701 F.3d 620, 630–31 (10th Cir. 2012), *abrogated on other grounds by Muldrow*, 144 S. Ct. at 975 (further citations and quotations omitted).

purposes of a pay discrimination claim, Plaintiff can satisfy this standard by showing that she was paid less than similarly situated employees of a different race or the opposite sex.[44]

In this case, Plaintiff cannot meet her burden because the employees she compares herself to are not similarly situated.[45] Rather, each comparative employee has a different date of hire, level of post-law school experience, and geographic location. For example, in 2022, Defendant hired Galvan who lived in New York City, and Wall and An who lived in Washington D.C. All three had post-law school work experience. Accordingly, all three were hired at an $80,000 starting salary because New York City and Washington D.C. are among the most expensive places to live in the United States. Additionally, both had work experience between graduating law school and working for Defendant.

In 2022, Defendant also hired Cooley who lived in Indianapolis. Although Indianapolis has a lower cost-of-living than New York City and Washington D.C., Cooley had significantly more post-law school work experience than Galvan, Wall, and An. Thus, she too was hired at an $80,000 starting salary. Ultimately, none of these four hires are similarly situated to Plaintiff because none were hired the same year, with the same level of post-law school experience, and in the same geographic region as Plaintiff.

However, four different employees are similarly situated to Plaintiff—specifically, the four sales directors Defendant hired in 2020 at the same time as Plaintiff. Of the four hires, all were females. Three were hired at $65,000, the same starting salary as Plaintiff, but Vega was paid $70,000 because she was living in New York City. Thus, these examples also fail to demonstrate

---

[44] *Young v. Physician Office Partners, Inc.*, 2020 WL 1446911, at *8 (D. Kan. Mar. 25, 2020) (citing *Taher v. Wichita State Univ.*, 526 F. Supp. 2d 1203, 1218 (D. Kan. 2007)).

[45] *Glapion v. Castro*, 646 F. App'x 668, 671 (10th Cir. 2016) (holding that employees who work in a different geographical region cannot be considered similarly situated).

that the discrepancies in Plaintiff's compensation were due to her gender or race. Rather, the evidence suggests that other factors such as experience, location, cost-of-living, and competition explain why certain employees were getting paid more than others.

In essence, Plaintiff views each employee in a vacuum instead of viewing each circumstance holistically. For example, although Cooley lived in a city with a lower cost of living than Wall, Cooley had more years of post-law school experience than Wall, thus warranting equal salaries. Vega and Galvan lived in the same city, but Galvan had more post-law school experience, thus warranting unequal salaries. When Plaintiff was hired, she had no post-law school experience, and she lived in a low-cost region. Therefore, viewing the evidence holistically, even in the light most favorable to Plaintiff, the Court concludes that she fails to demonstrate that the pay discrepancies she experienced were based on her gender or race. As such, she cannot demonstrate an adverse employment action. Accordingly, Defendant is entitled to summary judgment on Counts II and III.

**C.    Plaintiff's sexually hostile work environment claim**

In Count IV, Plaintiff claims that she was subjected to a sexually hostile work environment by unwanted sexual harassment in the form of texts, messages, and comments made by Kang, as well as management's response to her complaints.

A plaintiff bringing a sexually hostile work environment claim must prove that "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working

environment."[46] Here, Defendant challenges the second, third, and fourth element of Plaintiff's harassment claim. The Court begins and ends its analysis with the pervasiveness element.

In considering whether working conditions are sufficiently abusive or hostile, courts look to numerous factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[47]

Here, Plaintiff alleges three instances of harassment. First, in September 2020, she claims that Kang texted her a picture of a poster containing a nude adult male with the word "package" written over his genitalia. Second, in May 2021, she was out having dinner and drinks with a group of coworkers. When she tried to leave the restaurant, Kang told her that she should stay out with the group, rubbed her back a little bit, and stood in between Plaintiff and the exit. Plaintiff told him to stop and left the restaurant. Third, in July 2021, Kang sent Plaintiff a text message calling her "glowing" and "dazzling."[48] Plaintiff thanked Kang and responded, "Eric, you are my personal hype man, honestly."

After a few coworkers encouraged Plaintiff to cut off contact with Kang, Plaintiff messaged him in August 2021. Plaintiff told him that his comments on her appearance made her uncomfortable and asked him to refrain from doing so in the future. Kang apologized and never commented on her appearance again nor said or did anything further that made Plaintiff feel uncomfortable. Plaintiff resigned almost a year later in June 2022.

---

[46] *Jackson v. Kan. City Kan. Pub. Schs. Unified Sch. Dist. No. 500*, 799 F. App'x 586, 590 (10th Cir. 2020).

[47] *Nelson v. DeJoy*, 2024 WL 3507723, at *6 (10th Cir. July 23, 2024) (cleaned up) (citing *Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1249–50 (10th Cir. 2024)).

[48] Plaintiff claims that other comments were made, but when asked in her deposition what those comments said, she stated that she could not remember. No evidence, beyond Plaintiff's deposition, is provided for the Court's consideration on this matter.

No reasonable jury could find this conduct, even considering it in the light most favorable to the Plaintiff, sufficiently abusive or hostile as to affect the terms or conditions of her employment. In fact, Plaintiff testified that Kang's behavior was "sporadic," indicating that these events were isolated rather than pervasive. And "sporadic use of abusive language, gender-related jokes, and occasional teasing are among the ordinary tribulations of the workplace."[49] Apart from mere words, conduct must be extreme to amount to a change in the terms and conditions of employment, and isolated incidents will generally not amount to discriminatory changes in the terms and conditions of employment.[50] Isolated incidents can rise to the requisite level of severity but only when the conduct is "threatening and severe or especially egregious or extreme."[51] In this case, Plaintiff has failed to present sufficient evidence that Kang's words or conduct were severe or pervasive.

Additionally, the events Plaintiff perceived as harassment occurred in September 2020, May 2021, and June 2021. Three isolated events occurring over Plaintiff's 22-month-long employment are insufficient to support a hostile work environment claim.[52] Accordingly, Plaintiff fails to prove that the harassment was severe or pervasive; that the harassment altered a term, condition, or privilege of her employment; and that the harassment created an abusive working environment. For these reasons, Defendant is entitled to summary judgment on Count IV.

---

[49] *Chapman v. Carmike Cinemas*, 307 F. App'x 164, 171 (10th Cir. 2009) (further citations and quotations omitted) (noting that Title VII is not a "general civility code").

[50] *Brown v. Laferry's LP Gas Co.*, 708 F. App'x 518, 522 (10th Cir. 2017).

[51] *Id.* (further citations and quotations omitted).

[52] *Steele*, 189 F. Supp. 3d at 1166 (finding a five-month period "a relatively limited duration" to consider the circumstances pervasive); *Hernandez v. Data Sys. Int'l., Inc.*, 266 F. Supp. 2d 1285, 1309 (D. Kan. 2003) (finding that four isolated comments over the course of four years failed to demonstrate the "steady barrage" required to show a hostile work environment); *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (finding that two racial comments "fall far short of the 'steady barrage' required for a hostile environment claim"); *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (finding that five separate incidents over a sixteen month period were not sufficiently severe or pervasive to support a claim for hostile work environment).

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 40) is **GRANTED**.

**IT IS SO ORDERED.**

This case is closed.

Dated this 11th day of September, 2024.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE